**Carolyn G. WINKLER, Individually and as the Independent Executrix of the Estate of Bernie A. Winkler, et al., Plaintiffs–Appellants,**

v.

**ELI LILLY & CO. and Paul Smith, Defendants–Appellees.**

**Nos. 95–3913 and 95–4060.**

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1996.

Decided Dec. 3, 1996.

Paul F. Waldner, Archer, Waldner & Vickery, Houston, TX, Richard W. Ewing, Houston, TX, for Carolyn Winkler and other Winkler Plaintiffs–Appellants.

Robert K. Stanley, Brian K. Burke, Ellen E. Boshkoff, Baker & Daniels, Indianapolis, IN, for Eli Lilly & Co.

C. Vernon Hartline, Jr., Hartline, Dacus, Dryer & Kern, Dallas, TX, for Paul Smith.

Robert A. Holstein, Cory S. Berman, Holstein, Mack & Klein, Chicago, IL, for James Mahoney.

Before COFFEY, MANION, and ILANA DIAMOND ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

This is a case about attempts to discover the terms of a secret agreement. The Winkler family and James Mahoney are suing the defendant pharmaceutical company Eli Lilly & Co. for injuries allegedly caused by its prescription medication Prozac. The Judicial Panel on Multidistrict Litigation consolidated all federal Prozac cases for discovery and scheduling purposes. The Southern District of Indiana appointed defendant attorney Paul Smith as lead counsel. The Winklers and Mahoney are now appealing the imposition of a permanent injunction barring them from attempting to discover the terms of a secret agreement which Eli Lilly reached with Smith, who subsequently resigned as lead counsel, during the trial of a Prozac case in Kentucky. We are of the opinion that the district court abused its discretion in imposing the injunction, and vacate the injunction.

I.

Eli Lilly & Co. manufactures the drug Prozac, a widely prescribed psychoactive antidepressant medication. Over the past several years, hundreds of plaintiffs nationwide have attempted to sue Eli Lilly for injuries allegedly caused by ingesting Prozac. Many of these cases were either brought in, or removed to, federal court on the basis of diversity jurisdiction. Prozac litigation became so proliferous that in 1992, the Federal Judicial Panel on Multidistrict Litigation consolidated some seventy-five federal Prozac cases ("MDL–907") for discovery and assigned them to Judge Dillin in the Southern District of Indiana, where Eli Lilly maintains its corporate headquarters. They included a suit originally brought in Texas by the estate and family of Bernie Winkler, who committed suicide shortly after being prescribed Prozac, and another originally brought in Illinois by James Mahoney, claiming that he suffered behavioral changes as a result of using Prozac as prescribed by his doctor. Late in 1993, Texas attorney Paul Smith assumed the role of lead counsel for the multidistrict litigation. According to the district court, Smith spearheaded discovery and examination of 750,000 pages of documents from Eli Lilly, and conducted almost sixty depositions.

Smith maintains that the majority of his time was devoted to scheduling and conducting depositions.

At the same time, Smith was lead counsel in a Kentucky case, *Fentress v. Shea Communications,* the first major Prozac case to go to trial. The *Fentress* plaintiffs alleged that the Prozac caused a man taking the drug to go on a murderous rampage at his former place of employment. A cornerstone of plaintiffs' argument was that Eli Lilly's warnings about the drug's possible side-effects were inadequate, and that Eli Lilly withheld from American doctors warnings about adverse side-effects which the company disclosed to European doctors at the time it marketed the drug overseas. To bolster this argument, Smith, as lead counsel for the *Fentress* plaintiffs, sought throughout the trial—which eventually lasted 47 days—to introduce evidence that Eli Lilly had previously been convicted of and sanctioned for withholding evidence of adverse side-effects while obtaining approval from the Food and Drug Administration of a different drug. Judge Potter (the Kentucky state trial judge) initially ruled the conviction inadmissible as a prior bad act. During Eli Lilly's presentation of its defense, however, the company's attorneys elicited testimony from several witnesses that Eli Lilly was always willing to cooperate with the FDA. Following a day-long hearing, Judge Potter ruled that with the introduction of this testimony Eli Lilly had opened the door to use of the prior conviction, with the result that plaintiffs could introduce it in rebuttal.

At this time, Eli Lilly requested a day's recess. When the trial resumed, Smith closed his rebuttal case without ever referring to the evidence he had fought so long to introduce, and advised the judge that he would raise it in the damages phase of the trial. Suspicious, Judge Potter asked the parties if they had reached an agreement settling the case. They assured him, off the record, that they had not. The case went to the jury, which returned a verdict finding that the drug Prozac was not unreasonably dangerous and defective, and thus Eli Lilly was not responsible for any of the injuries.

Accordingly, on January 25, 1995, the trial judge entered a judgment dismissing the case with prejudice. Smith did not appeal on behalf of the plaintiffs. Thereafter Eli Lilly made the verdict the centerpiece of a national publicity campaign, touting the safety of Prozac.

Judge Potter, however, remained suspicious of the result, particularly after hearing rumors that the parties had in fact reached a settlement. Even though judgment had been entered, he again confronted Smith and Eli Lilly. Both admitted that they reached an agreement during the recess of the *Fentress* trial, but insisted that the agreement was not a "settlement," and that no money had changed hands. They refused to disclose the terms of the agreement. As a result, three months after entering judgment, Judge Potter issued an order to show cause why the original judgment should not be amended to reflect that it was the result of a settlement, not a verdict. He issued subpoenas ordering counsel to appear before the court and explain to the court the nature of the agreement they had reached, as well as disclose any written documentation of the agreement between the parties. Smith and Eli Lilly sought a Writ of Prohibition from the Kentucky Court of Appeals, barring Judge Potter from proceeding any further in his inquiry. While the *Fentress* agreement itself remains secret to this day, we can glean from the parties' motions in the Kentucky courts the fact that they did reach an agreement before they submitted the case to the jury. Eli Lilly agreed to pay plaintiffs an amount certain even if the jury found in its favor. Furthermore, both parties agreed not to appeal. They also agreed that the very existence of the agreement was to remain secret. Their motions, as well as later testimony in federal court, indicate that the agreement also contained "something"[1] regarding Smith's role as lead counsel in the consolidated litigation before the federal court. The Kentucky Court of Appeals issued the Writ of Prohibition, ruling that Judge Potter lacked jurisdiction to revise the judgment; Judge Potter appealed to the Supreme Court of Kentucky. That is where matters stood in the summer of 1995. (After

1. Exactly what has never been revealed.

oral argument in this case was completed, the Supreme Court of Kentucky reversed the state appellate court, quashed the writ, and ordered Smith and Eli Lilly to disclose the *Fentress* agreement to Judge Potter, ruling that even after entry of judgment of the jury's verdict in favor of Eli Lilly, he had jurisdiction, under the inherent powers doctrine,[2] to ensure that the judgment was correct.)

On July 11, 1995, after the Kentucky Court of Appeals had issued the writ prohibiting Judge Potter from probing further into the *Fentress* agreement, Smith moved to withdraw as lead counsel in the multidistrict litigation. He told the court that he sought no compensation for the work he performed as lead counsel, and indicated that he also intended to withdraw entirely from the federal Prozac cases with which he had been associated. Several parties to the multidistrict litigation, apparently fearing that the court would lose jurisdiction over the issue if it were not settled while Smith remained lead counsel, vigorously argued that Smith should not be allowed to withdraw until he disclosed the terms of the *Fentress* agreement, particularly any terms that referred to Smith's role in the multidistrict litigation. On July 27, 1995, the district court granted Smith's motion to withdraw. No evidentiary hearing was held; the district judge declined to pursue a suggestion that he examine the *Fentress* agreement *in camera*. Judge Dillin, after the July 27th ruling, concluded that for the most part common discovery was all but complete, and remanded most of the Prozac cases back to their respective district courts. The court also gave Mahoney permission to join a non-diverse defendant, and remanded his case to Illinois state court.[3]

Plaintiffs did not request that the trial court certify its decision to let Smith withdraw as lead counsel for interlocutory appeal. Rather, they turned to other avenues in their attempt to uncover the terms of the *Fentress* agreement. In Illinois, Mahoney subpoenaed Smith's co-counsel Nancy Zettler—who, after Smith's withdrawal, became custodian of all the documents discovered in the multidistrict litigation—for the admitted purpose of asking her about the *Fentress* agreement. The Winklers, whose initial Prozac case remains in federal court under the jurisdiction of the Southern District of Indiana ("*Winkler I*"), filed suit against attorney Paul Smith in Texas state court, charging him with breach of fiduciary duty as lead counsel in the MDL–907 litigation ("*Winkler II*"). The Winklers joined Eli Lilly as defendant, charging the company with tortiously interfering with their relationship with Smith. Eli Lilly, over the Winklers' objections, removed the case to the federal district court in San Antonio, Texas, where the parties continued to question whether or not there was federal jurisdiction.

Smith and Eli Lilly thereafter returned to Judge Dillin, and requested that he issue a writ of prohibition enjoining the plaintiffs, and anyone else who might seek to do so, from attempting to discover the terms of the *Fentress* agreement. Following a hearing and oral argument at which the court refused to receive any evidence concerning the agreement, the judge agreed and, pursuant to his authority under the All Writs Act, 28 U.S.C. § 1651,[4] issued a permanent injunction:

1. All plaintiffs in all cases ever included in multidistrict litigation docket no. 907 and all counsel who are or have been of record in MDL 907 are hereby prohibited and enjoined from seeking by any means or any proceedings of any kind in any state or federal court discovery or disclosure of any information relating to confidential

---

**2.** Under the inherent powers doctrine, courts have the historic authority to grant such equitable relief as is necessary to protect the integrity of their judgments and the proceedings before them. This includes the power to set aside fraudulently begotten judgments, as well as the power to conduct independent investigations in order to determine whether the court has been the victim of fraud or deceit. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991).

**3.** It is worth noting, however, that the attorneys who represent Mahoney also continue to represent other parties whose Prozac suits remain part of the multidistrict litigation.

**4.** The All Writs Act provides that "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

agreements and related discussions between Eli Lilly and Company or its representatives and attorney Paul L. Smith or his associated attorneys or employees or any client or clients of attorney Paul L. Smith, including plaintiffs in the Kentucky state court action *Fentress, et al. v. Shea Communications, et al.*

The injunction also specifically barred the Winklers from taking further action in *Winkler II,* and forbade Mahoney and his attorneys from further attempts to subpoena Nancy Zettler. This appeal followed.

## II.

### A.

Initially, the plaintiffs argue that the injunction the district court issued violated the principles of federalism and comity codified in the Anti–Injunction Act, which statutorily prohibits a federal court from enjoining ongoing state proceedings. 28 U.S.C. § 2283. Plaintiff Mahoney notes that his case was pending in the Illinois courts at the time Judge Dillin issued the injunction, and therefore the Act, by its terms, applies. *See Dombrowski v. Pfister,* 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 1119 n. 2, 14 L.Ed.2d 22 (1965) (Anti–Injunction Act applies only to state proceedings actually begun at the time the injunction is issued). While *Winkler II* has been removed to federal court, the Winkler family argues that it was removed on frivolous grounds and, were the suit not enjoined, would inevitably be remanded to state court. We need not reach that argument, because we conclude that even if *Winkler II* were still in state court, the Anti–Injunction Act would not deprive Judge Dillin of the authority to issue an injunction against these plaintiffs to protect the integrity of his pre-trial ruling.

■ The Anti–Injunction Act, originally enacted in 1793, provides:

A court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by. Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283. The district court initially reasoned that its injunction did not violate

the Act because it did not completely stay any state "proceeding;" rather, it prevented the state courts from conducting parallel and duplicative discovery of a discreet issue. This ignores the fact that, as Justice Brandeis explained over half a century ago, "proceeding" is a comprehensive term, covering parties to state court litigation as well as the court itself, and including all supplemental or ancillary actions "taken with a view to making the suit ... effective." *Hill v. Martin,* 296 U.S. 393, 403, 56 S.Ct. 278, 282, 80 L.Ed. 293 (1935); *see also Leathe v. Thomas,* 97 F. 136, 138 (7th Cir.1899) ("The prohibition of the statute [extends] ... to the entire proceedings from commencement of the suit until the execution issued on the judgment or decree is satisfied"). A court's power to guide discovery is concomitant with its duty to provide effective management of complex litigation. *Marrese v. American Academy of Orthopaedic Surgeons,* 726 F.2d 1150, 1159, 1162 (7th Cir.1984) (*en banc*), *rev'd in part on other grounds,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). Consequently, the definition of "proceeding" sweeps broadly enough to include state discovery actions. As a result, a federal injunction which falls short of bringing a state suit to a complete halt may nonetheless violate the Anti–Injunction Act.

■ The express language of the Anti–Injunction Act, however, excepts from its interdict injunctions "necessary in aid of [a federal court's] jurisdiction." 28 U.S.C. § 2283. This exception, the Supreme Court teaches, means that an injunction may be issued where "necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970). The exception thus parallels the federal courts' power under the All Writs Act "to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Telephone,* 434 U.S. 159, 173, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977). No one denies that the

district court had jurisdiction over the federal Prozac cases when it issued its July 27th ruling.[5]

■ Accordingly, the question is whether a federal court has the authority to issue an injunction to protect the integrity of a discovery order. Ordinarily, the "aid of jurisdiction" exception to the Anti–Injunction Act applies only to parallel state *in rem* rather than *in personam* actions. *See Vendo Co. v. Lektro–Vend Corp.,* 433 U.S. 623, 641–42, 97 S.Ct. 2881, 2892–93, 53 L.Ed.2d 1009 (1977). There are, however, exceptions to this rule, most notably school desegregation cases, where conflicting orders from different courts would only serve to make ongoing federal oversight unmanageable. *See Garcia v. Bauza–Salas,* 862 F.2d 905, 909 (1st Cir. 1988). Other courts have extended the exception to consolidated multidistrict litigation, where a parallel state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation. *Id.; Carlough v. Amchem Products, Inc.,* 10 F.3d 189, 197 (3d Cir.1993); *In re Baldwin–United Corp.,* 770 F.2d 328, 336 (2d Cir.1985); *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1332, 1334–35 (5th Cir.1981). We agree that the "necessary in aid of jurisdiction" exception should be construed "to empower the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's jurisdiction nugatory." Martin H. Redish, *The Anti–Injunction Statute Reconsidered,* 44 U.Chi.L.Rev. 717, 754 (1977).

■ In the case at bar, the district court quite reasonably believed that the plaintiffs were resorting to the state courts for the specific purpose of evading its ruling denying discovery of the *Fentress* agreement. The

principles of federalism and comity which the Anti–Injunction Act is meant to protect include a strong and long-established policy against forum-shopping. *See Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.,* 886 F.2d 1485, 1492 (7th Cir.1989); *Freeman v. Kohl & Vick Machine Works, Inc.,* 673 F.2d 196, 198 n. 2 (7th Cir.1982). The districts courts' power to control multidistrict litigation is established by statute, 28 U.S.C. § 1407, and as we have already noted, that with that power comes the duty to exercise it as efficiently as possible. *Marrese,* 726 F.2d at 1161. An important aspect of that control is to prevent predatory discovery, especially of sensitive documents, ensuring that litigants use discovery properly as an evidence-gathering tool, and not as a weapon. *Id.* at 1161–62. Indeed, an express purpose of consolidating multidistrict litigation for discovery is to conserve judicial resources by avoiding duplicative rulings.[6] *Matter of Orthopedic Bone Screw Products Liability Litigation,* 79 F.3d 46, 48 (7th Cir.1996). Where a litigant's success in a parallel state court action would make a nullity of the district court's ruling, and render ineffective its efforts effectively to manage the complex litigation at hand, injunctive relief is proper.

Delineation of federal courts' authority to issue injunctions "in aid of their respective jurisdictions" under the All Writs Act, 28 U.S.C. § 1651, supports this conclusion. The All Writs Act, the Supreme Court teaches, permits a federal court to support its jurisdiction, by "issu[ing] such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Telephone,* 434 U.S. at 173, 98

---

**5.** By the time defendants sought the injunction, Judge Dillin had remanded most of the consolidated cases back to their respective district courts. The mere fact of that remand, however, did not deprive him of jurisdiction to issue the injunction. It would vitiate much of the purpose of consolidating litigation if, after remand, parties could simply re-visit the transferee court's pre-trial rulings, and force the common defendant to deal piecemeal with once-collective matters. Accordingly, just as courts retain jurisdiction to protect the integrity of their judgments after the judgment has issued, *Chambers,* 501 U.S. at 43, 111 S.Ct. at 2132, so we believe that a

transferee court's statutory power to control multidistrict litigation necessarily includes the equitable power, after remand, to interpret the scope and protect the integrity of orders it issued while in charge of the consolidated lawsuits.

**6.** The mere undesirability of duplicative rulings does not, of course, trump the Anti–Injunction Act and empower courts conducting multidistrict litigation to enjoin independent prior state court proceedings—like, for example, the *Fentress* case—unless the court has otherwise obtained jurisdiction.

S.Ct. at 372 (emphasis added). As previously noted, the "aid of jurisdiction" language in the All Writs Act parallels that of the Anti–Injunction Act, and courts regularly construe the two statutes similarly with respect to their "aid of jurisdiction" clauses. *Carlough v. Amchem Products,* 10 F.3d at 201 n. 9. Consequently, we believe the two statutes in concert permit a district court, under certain circumstances, to issue an injunction to safeguard a pre-trial ruling like the discovery order at issue here.

Litigants who engage in forum-shopping, or otherwise take advantage of our dual court system for the specific purpose of evading the authority of a federal court, have the potential "to seriously impair the federal court's flexibility and authority to decide that case." *Atlantic Coast Line R.R.,* 398 U.S. at 295, 90 S.Ct. at 1747. Indeed, although an injunction is extraordinary relief, where such abuses exist, failure to issue an injunction may create the very "needless friction between state and federal courts" which the Anti–Injunction Act was designed to prevent. *Oklahoma Packing Co. v. Oklahoma Gas & Elec. Co.,* 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 537 (1940); *see also Baldwin,* 770 F.2d at 337 ("To the extent that the impending state court suits were vexatious and harassing, our interest in preserving federalism and comity with the state courts is not significantly disturbed by the issuance of injunctive relief"). For these reasons, we hold that the Anti–Injunction Act does not bar courts with jurisdiction over complex multidistrict litigation from issuing injunctions to protect the integrity of their rulings, including pre-trial rulings like discovery orders, as long as the injunctions are narrowly crafted to prevent specific abuses which threaten the court's ability to manage the litigation effectively and responsibly.

 In the case at bar, we note that the district court enjoined not only the *Mahoney* and *Winkler* plaintiffs, but also "[a]ll plaintiffs in all cases ever included in multidistrict litigation docket no. 907 and all counsel who are or have been of record in MDL 907." Given the facts in the case before us, this broad language sweeps too many people within its interdict, and such a far-reaching and overly expansive injunction is an abuse of discretion. *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1272 (7th Cir.1995). Such an injunction would, for example, include a plaintiff whose case was consolidated in the multidistrict litigation, but remanded to state court long before the quarrel over the *Fentress* agreement arose, or even before Smith became lead counsel. Such a plaintiff could not be accused of forum-shopping. It might also encompass a plaintiff whose case had been wrongly removed to federal court and over whom the district court never had jurisdiction. The court would have no more power to enjoin such a plaintiff than it would to enjoin the ongoing *Fentress* proceedings in Kentucky.[7] We are of the opinion that the district court has authority under the Anti–Injunction Act to enjoin only those persons (and their counsel) whose cases are presently part of federal multidistrict litigation, or who were properly part of such multidistrict litigation at the time the court granted Smith's motion to withdraw as lead counsel.

**B.**

 The mere fact that Judge Dillin had the authority to take action to protect his pre-trial rulings does not end our inquiry, since power alone is insufficient to sustain the entry of an injunction. *Federal Savings & Loan Ins. Corp. v. PSL Realty Co.,* 630 F.2d 515, 522 (7th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). We must also determine whether the injunction was a proper expression or exercise of that authority. We may reverse a decision to grant a permanent injunction only if we are convinced that the district court abused its discretion in deciding that the circumstances of the case justified injunctive relief. *United States v. Kaun,* 827 F.2d 1144, 1148 (7th Cir.1987). Abuse of discretion, however, is a flexible term which "covers a range of degrees of deference rather than denoting a point within that range."

---

7. *New York Telephone* is not to the contrary. That case establishes that courts have the authority to enjoin non-parties who "are in a position to frustrate the implementation of a court order," but only "under appropriate circumstances." 434 U.S. at 174, 98 S.Ct. at 373. The circumstances in the case at bar are simply not appropriate for such a sweeping injunction. Unlike the defendants, our concern is not that the *Fentress* agreement remain sacrosanct but, as stated above, that litigants not engage in forum-shopping for the specific purpose of evading the authority of a federal court.

*Schering Corp. v. Illinois Antibiotics Co.,* 62 F.3d 903, 908 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996). Obviously, a district court would abuse its discretion if it applied an incorrect legal standard or based its injunction on a clearly erroneous finding of fact. *Kaun,* 827 F.2d at 1148; *Warner–Lambert Co. v. Northside Development Corp.,* 86 F.3d 3, 6 (2d Cir.1996); *cf. Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996). Consequently, "to properly understand our role on review, we must carefully analyze the process employed by the district court." *Darryl H. v. Coler,* 801 F.2d 893, 898 (7th Cir.1986). As noted before, the district court issued the injunction to protect the integrity of its July 27th ruling denying discovery of the *Fentress* agreement in the MDL–907 litigation. Our task, then, is to determine whether that underlying ruling is worthy of the type of extraordinary relief which the district court granted. We conclude, under the facts of the case before us, that it is not.

■ Initially, we note that although the district court treated the question of the *Fentress* agreement as a discovery dispute, the main issue before the court that July 27th was whether to grant Smith's motion to withdraw as lead counsel. The court concluded that discovery of the contents of the secret agreement was not a bar to Smith's withdrawal. We do not quarrel with the district court's basic decision not to force Smith to remain as lead counsel until he disclosed the terms of the *Fentress* agreement.

The transcript of the hearing reveals that while the propriety of allowing discovery was the subject of rather lengthy debate, there was little if any inquiry into the substance of the *Fentress* agreement. Several times during the hearing, Eli Lilly's attorneys offered to make full disclosure of the *Fentress* agreement and the negotiations surrounding it, as long as the disclosure was made *in camera* rather than in open court. The district court, for reasons undisclosed in the record, erroneously believed that no such inquiry was necessary. The transcript makes clear that the court was more concerned with not

intruding on Smith's right to settle the *Fentress* case on behalf of his Kentucky clients. The court conceded that, aside from an agreement not to appeal, "I don't know if there's anything else to it whatsoever. [But they] had a right to keep that confidential." Judge Dillin directed no questions to Smith about the nature of the agreement. Eli Lilly's lead attorney conceded that he was not even privy to the *Fentress* agreement. However, when he offered to yield to an attorney who was actively involved, the district court simply said, "No, I'm not interested in the *Fentress* case." Judge Dillin then concluded, "It is just obvious to me there's no connection whatsoever [between the *Fentress* agreement and the multidistrict litigation], and I so find."

■ Eli Lilly's attorney conceded that the *Fentress* agreement included references to the multidistrict litigation. Given that concession, plaintiffs' desire for assurance that the agreement had no impact on the federal litigation is not unreasonable. Since the terms of the agreement remain undisclosed, Judge Dillin's assertion that there was "no connection whatsoever" between *Fentress* and the multidistrict litigation is as much speculation as plaintiffs' anxiety that Smith might have agreed to hinder their cases by, for example, destroying or hiding helpful documents. Had the district court seen fit to make a thorough factual inquiry into the substance of the *Fentress* agreement, and had it then concluded that it had no possible impact on the multidistrict litigation, we would not hesitate—if the record supported the court's action—to affirm an appropriately crafted injunction. But an injunction based on nothing but speculation and conjecture is as much an abuse of discretion as an injunction based on clearly erroneous facts. *See Warner–Lambert,* 86 F.3d at 6. Until such a substantive inquiry is made, the sparseness of the record before us leads us to believe that there is no way of knowing whether the secret agreement confirms the district court's best hopes, or plaintiffs' worst fears. Consequently, we are convinced that the extraordinary remedy of injunctive relief is inappropriate in this case.

Events which took place during the pendency of this appeal also have an impact upon our ruling. In issuing the injunction, Judge Dillin wrote that "there [is no] indication that the agreement settled the dispute in any sense that would render the jury's deliberations either irrelevant or somehow tainted." He also complained, during the July 27th hearing on Smith's motion to withdraw as lead counsel, that the plaintiffs were "in effect [asking me] to review the judgment of the court of appeals of the Commonwealth of Kentucky," added that "If it's a state case in another state, it's up to the appellate court, I'm not interested in that," and stressed that he was not about "to second guess the court of appeals of the Commonwealth of Kentucky." Indeed, the court reiterated its deference to the Kentucky courts when it issued the injunction, stating as rationale that "equity will be served by prohibiting those named in the Order from approaching scores of fora in an effort to find somebody who will order discovery of materials *that the Kentucky state courts* and this Court have thus far declined to order." (emphasis added).

Shortly thereafter, however, the Supreme Court of Kentucky dissolved the writ of prohibition, forbidding Judge Potter from inquiring into the *Fentress* agreement, which the state appellate court had issued. In so doing, the state Supreme Court found and reasoned that the parties had indeed reached "some sort of settlement" before submitting the case to the jury,[8] adding that "there was a serious lack of candor with the trial court and there may have been deception, bad faith conduct, abuse of the judicial process or perhaps even fraud." *Potter v. Eli Lilly & Co.*, 926 S.W.2d 449, 454 (Ky.1996). The effect of this ruling is that Smith and Eli Lilly will have to disclose to Judge Potter the terms of the *Fentress* agreement. It also means that any deference to the state court under whose auspices the *Fentress* agreement was reached now tips the scales for, rather than against, disclosure.

## C.

Finally, plaintiffs urge us to set forth the duties which lead counsel in multidistrict liti-

gation proceedings owe to other parties to the litigation, and to subordinate counsel. Our jurisdiction, however, is limited to present cases and controversies; we refuse to render advisory opinions. *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615, 620 (7th Cir.1995). The entire point of the instant appeal is that no one knows the terms of the agreement which Smith reached with Eli Lilly, or what impact, if any, the agreement might have on other parties to the multidistrict litigation. A side-agreement is not of itself intrinsically improper, though we do note that parties, like those in the case before us, with dual and potentially conflicting loyalties, like Smith toward both the *Fentress* and MDL–907 plaintiffs, *see* Manual for Complex Litigation (Second) § 20.222, might be well advised in crafting any side-agreement to proceed in such a manner that all interested parties, including the court, could rely on their good faith and integrity. Such an approach would help litigants avoid protracted and bitter legal battles like the one that has given rise to this appeal. Along the same lines, we observe that while an attorney should be a zealous advocate on behalf of his or her client, the kind of acrimonious language which pervades both parties' appellate briefs in this case is neither helpful to the court in reaching a just decision, nor does it enhance the reputation of the respective attorneys or the legal profession as a whole. Nonetheless, until we know whether a justiciable controversy exists, any analysis which we might provide on the abstract question of the ethical and fiduciary duties of lead counsel in multidistrict litigation, anticipating that the *Fentress* agreement was indeed improper, would be an improper advisory opinion. *Id.*

## CONCLUSION

While we conclude that district courts in charge of complex multidistrict litigation have the authority to issue injunctions to protect the integrity of their pre-trial rulings, the ruling which the instant injunction seeks to protect lacks sufficient factual underpinnings. Because the district court based the

8. Eli Lilly and Smith still maintain that their agreement did not constitute a settlement.

injunction on inadequate facts, which necessarily forces us to speculate because of an insufficient record before us on review, we are of the opinion that granting the injunction was an abuse of discretion, and order that the injunction be vacated. Should either of the parties wish to pursue the possibility of a more limited form of injunctive relief, consistent with this opinion, they may file an appropriate motion with the district court.

VACATED.