

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-2007

# Grider v. Keystone Health Plan

Precedential or Non-Precedential: Precedential

Docket No. 07-1231

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Grider v. Keystone Health Plan" (2007). *2007 Decisions.* Paper 483.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/483

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 07-1231, 07-1232 and 07-1270

———

NATALIE M. GRIDER, M.D.;
KUTZTOWN FAMILY MEDICINE, P.C.

v.

KEYSTONE HEALTH PLAN CENTRAL, INC.;
THOMAS F. BICKMAN; HIGHMARK, INC.;
JOHN S. BROUSE; CAPITAL BLUECROSS;
JAMES M. MEAD; JOSEPH PFISTER

Keystone Health Plan Central, Inc.;
Capital BlueCross; James M. Mead; Joseph Pfister,
Appellants, No. 07-1231

Highmark, Inc.; John S. Brouse,
Appellants, No. 07-1232

*CROWELL MORING LLP;
KATHLEEN TAYLOR SOOY;
MICHAEL L. MARTINEZ,
Appellants, No. 07-1270
(*Pursuant to F.R.A.P. 12(a))

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 01-cv-05641)
District Judge:  Honorable James Knoll Gardner

––––––

Argued June 19, 2007
Before:  McKEE, FISHER and CHAGARES, *Circuit Judges*.

(Filed:   August 28, 2007)

Malcolm J. Gross
Gross, McGinley, LaBarre & Eaton
33 South 7th Street
P.O. Box 4060
Allentown, PA  18105

Kathleen T. Sooy (Argued)
Clifton S. Elgarten
Tracy A. Roman
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2505
        *Attorneys for Appellants (No. 07-1231),*
        *Keystone Health Plan Central, Inc.,*
        *Capital BlueCross, James M. Mead*
        *and Joseph Pfister*

Daniel I. Booker
Donna M. Doblick
James C. Martin (Argued)
Reed Smith
435 Sixth Avenue
Pittsburgh, PA  15219

Sandra A. Girifalco
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
Philadelphia, PA  19103
    *Attorneys for Appellants (No. 07-1232),*
    *Highmark, Inc. and John S. Brouse*

Clifton S. Elgarten
Tracy A. Roman
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2505
    *Attorneys for Appellants (No. 07-1270),*
    *Crowell Moring LLP, Kathleen Taylor*
    *Sooy and Michael L. Martinez*

Louis C. Bechtle
Conrad, O'Brien, Gellman & Rohn
1515 Market Street, 16th Floor
Philadelphia, PA  19102

Joseph A. O'Keefe
O'Keefe & Sher
15019 Kutztown Road
Kutztown, PA  19530

Francis J. Farina
577 Gregory Lane
Devon, PA  19333

Kenneth A. Jacobsen (Argued)
12 Orchard Lane
Wallingford, PA  19086
        *Attorneys for Appellees,*
        *Natalie M. Grider, M.D., and*
        *Kutztown Family Medicine, P.C.*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

This appeal requires us to explore the limits of the All Writs Act, 28 U.S.C. § 1651(a), as it relates to actions by one federal court that may affect those in a different federal court. Specifically, in this case, Dr. Natalie Grider and Kutztown Family Medicine P.C., representing a class of approximately 6,000 doctors in Central Pennsylvania, filed a suit against Keystone Health Plan Central, Inc. ("Keystone"); Keystone's two former fifty-percent owners, Highmark, Inc. ("Highmark")

4

and Capital Blue Cross ("Capital"); and each company's chief executive officer, Joseph Pfister, John Brouse, and James Mead. The suit alleges that Keystone's claims handling practices violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 - 1968, and Pennsylvania's "prompt pay" statute, 40 Pa. Stat. §§ 991.2101 – 991.2193. Around that time, similar nationwide claims were consolidated by a Multidistrict Litigation ("MDL") panel in the United States District Court for the Southern District of Florida ("Florida MDL"), which declined to add the *Grider* case as an tag-along action because it was at a more advanced stage in its proceedings. Recently, however, as the parties in the Florida MDL moved towards a comprehensive settlement agreement, the United States District Court for the Eastern District of Pennsylvania issued an injunction under the All Writs Act prohibiting the *Grider* Defendants from settling or attempting to settle claims in the Florida MDL that would have the effect of also settling the claims in *Grider*. The question presented to us is whether this is a permissible exercise of power under the All Writs Act. For the reasons that follow, we conclude that it is not, and we will therefore vacate the injunction issued by the District Court.

I.

A. The *Grider* Case

This case involves a certified class of approximately 6,000 doctors in Central Pennsylvania who were providers with the Keystone health maintenance organization ("HMO"), which operates exclusively in Central Pennsylvania. These doctors had

5

signed contracts with Keystone to provide medical services to patients who subscribed to the Keystone HMO. To receive reimbursement for services they provided to subscribers, the doctors submitted claims on forms provided by Keystone, using a standardized set of numerical codes provided by the American Medical Association, which are referred to as "CPT codes." These codes are provided for virtually every medical procedure in order to avoid variations in descriptions given by doctors. Because each code only represents a single procedure, one visit to a doctor may result in a reimbursement claim containing multiple CPT codes. A typical claim form, for instance, may have one code for the office visit itself, and another for the administration of a particular test.

During the class period certified by the District Court, when a doctor within Keystone's network submitted one of these claim forms, it was processed through a company named Synertech, Inc. ("Synertech"). Synertech is located in Central Pennsylvania, and used a proprietary software system owned by Tingley, Inc. to process these claims.

In addition to being reimbursed on a fee-for-service basis, many doctors in Keystone's network also received reimbursements for certain pools of patients – usually employees of a large employer – under contractual "capitation" arrangements with Keystone. Approximately 28% of the certified class members in this case are family practice providers, most of whom were under contractual capitation arrangements with Keystone. Under these capitation agreements, doctors are paid a set monthly fee in exchange for providing basic medical services – such as examinations and

treatment for minor illnesses – to a pool of patients. More complicated medical procedures not on the list of capitation services are supposed to be billed to Keystone and paid on a fee-for-service basis.

On October 5, 2001, the Plaintiffs in this case filed an action in Pennsylvania state court, which the Defendants promptly removed to the United States District Court for the Eastern District of Pennsylvania. The suit alleges that Keystone violated RICO by not processing and paying claims as it had promised to do in its contracts and other communications with the doctors in its network. According to the Plaintiffs, Keystone used automated systems and software built into Synertech's computerized claims processing operations to systematically "bundle" two or more CPT codes. By doing so, it would pay for only one procedure, thereby reducing payments to doctors. The Plaintiffs also allege that Keystone used Synertech's software to systematically "downcode" the doctors' claims by automatically changing the CPT code on a claim form to a less costly procedure.

In terms of the capitation agreements, the Plaintiffs allege that Keystone secretly reduced monthly capitation payments to participating doctors. Specifically, they claim that Keystone "shaved" capitation payments by "secretly: 1) shifting patients off of a doctor's capitation roster to so-called 'dummy accounts' set up by Keystone, whereby doctors continued to treat the insured patient and Keystone continued to collect premiums for medical insurance paid by or on behalf of the member, but retained those premiums for itself instead of paying them to the doctor; and 2) delaying capitation payments to providers for

7

newly enrolled members assigned to that doctor's capitation roster."

In addition to these claims, the complaint also alleges violations of Pennsylvania's "prompt pay" statute, which requires insurers to reimburse doctors within forty-five days after receiving a reimbursement claim.

On December 21, 2006, following three years of discovery, the District Court certified a class of providers in the Keystone network who were alleged to have been defrauded by the practices described in the complaint. The class includes:

> All medical service providers in connection with medical services rendered to patients insured by Keystone Health Plan Central Inc. who during the period January 1, 1996 through October 5, 2001:
>
>> (1) submitted claims for reimbursement on a fee-for-service basis for covered services which claims were denied or reduced through the application of automated edits in the claim processing software used by defendants to process those claims; and/or
>>
>> (2) received less in capitation payments than the provider was entitled through the use and

> application of automated systems to "shave" capitation payments in the manner alleged in plaintiffs' Amended Complaint filed October 6, 2001.

*Grider v. Keystone Health Plan Cent., Inc.*, No. 2001-CV-05641, 2007 WL 201011, *2 (E.D. Pa. Jan. 19, 2007). Now that the class is certified, the case appears to be headed towards trial.

## B. The *Love* and *Solomon* Cases in Florida

The *Grider* case was just one of many similar cases that were being filed around the country at the time. On May 22, 2003, three doctors from Alabama, one doctor from Puerto Rico, and the medical societies of South Carolina, Louisiana, Northern Virginia, and Puerto Rico, filed a complaint in the United States District Court for the Southern District of Florida against sixty-nine separate Blue Cross and Blue Shield companies throughout the United States ("Blues defendants"), and their national trade association, the Blue Cross and Blue Shield Association ("the Association"). Capital and Highmark are among the specifically named defendants, but Keystone is not.[1] The case, which is now

---

[1] Keystone Health Plan East, Inc., which is a wholly owned subsidiary of Independence Blue Cross operating out of the Philadelphia area, is named as a defendant in *Love*. The complaint also purports to include the subsidiaries of all of the named defendants, which ostensibly would cover Keystone Health Plan Central. However, while some of those subsidiaries

known as the *Love* case (formerly, it was known as *Thomas*), No. 03-21296 (S.D. Fla.), was eventually assigned to District Judge Federico Moreno. It alleges a national conspiracy among the Blues defendants, with the Association as the "hub," to bundle and downcode claims and to delay payments to providers under contract with the defendant HMOs.

On November 4, 2003, thirteen chiropractic physicians, podiatrists, physical therapists, and psychologists from Florida, Texas, Oregon, and Arizona filed the action now known as *Solomon*, No. 03-22935 (S.D. Fla.). The *Solomon* case involves essentially the same claims as *Love*. As in *Love*, both Capital and Highmark are named defendants. Although the complaint purports to include the subsidiaries of all of the named defendants as defendants themselves, it does not specifically list Keystone as a defendant in the case.

The *Love* and *Solomon* cases are part of the consolidated multidistrict proceedings being conducted in the United States District Court for the Southern District of Florida (MDL No. 1334) pursuant to 28 U.S.C. § 1407. On March 27, 2004, Highmark and Capital filed notice with the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407(c)(ii) arguing that the *Grider* case would be appropriate for transfer to the Florida MDL proceedings as a tag-along action. Keystone did not join the motion to transfer. On August 10, 2004, the Chairman of the Judicial Panel on Multidistrict Litigation

are specifically listed, Keystone Health Plan Central is not a specifically named defendant.

entered an order denying transfer of the *Grider* case to the Florida MDL.  The order explained that

> while *Grider* shares some questions of fact with actions in this litigation previously centralized in the Southern District of Florida, inclusion of *Grider* in MDL-1334 proceedings in the Southern District of Florida will not necessarily serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.  We point out that *Grider* is nearly three years old with a discovery cutoff date of less than five months away.  Moreover, alternatives to Section 1407 transfer exist that can minimize whatever possibilities there might be of duplicate discovery, inconsistent pretrial rulings, or both.

*Grider*, 2007 WL 201011, *6 (quoting Judicial Panel on Multidistrict Litigation Order Denying Transfer (Aug. 10, 2004)) (internal quotation marks omitted).  Accordingly, the *Grider* case continued to proceed independently of the Florida MDL.

## C.  *Grider* Injunction Decision

On November 29, 2006, Highmark's counsel announced that Highmark had joined a "substantial majority" of Blues defendants in *Love* who had decided to settle that litigation, and that the *Grider* claims would be released under a broad release negotiated as part of that settlement.  However, because of the confidentiality of the pending settlement agreement, Highmark's

11

counsel would not discuss any details at that time. Plaintiffs' counsel in *Love* subsequently confirmed that Highmark had agreed to settle the *Love* litigation, and that the release in *Love* would also release claims against all present and former subsidiaries of any defendant in *Love*, which would include Keystone.

After learning of this pending settlement agreement, the Plaintiffs in *Grider* filed a motion for a preliminary injunction against Highmark, Capital, and other co-defendants, to enjoin them from settling the *Grider* claims as part of the Florida *Love* and *Solomon* settlements. Subsequently, on January 19, 2007, the United States District Court for the Eastern District of Pennsylvania granted the injunction sought by the Plaintiffs. Its order provides that:

> IT IS ORDERED that plaintiffs' motion for an injunction is granted.
>
> IT IS FURTH[E]R ORDERED that pursuant to the All Writs Act, 28 U.S.C. § 1651(a), the court enjoins defendants Keystone Health Plan Central, Inc.; Highmark, Inc.; John S. Brouse; Capital Blue Cross; James M. Mead; Joseph Pfister; their attorneys, including, but not limited to, Michael L. Martinez, Kimberly J. Krupka, Kathleen Taylor Sooy, Sandra A. Girifalco, Mary J. Hackett, Steven E. Siff and their respective law firms; and anyone acting [o]n their behalf or in concert with them, from settling, or attempting to settle, the class and subclass claims in, or any part

12

of, the within litigation, which claims the undersigned certified by Order and Opinion dated December 20, 2006, and filed December 21, 2006, and which are pending before this court, in any other forum without the express approval of this court.

IT IS FURTHER ORDERED that the aforesaid persons and firms are specifically enjoined from settling, or attempting to settle, the certified class and subclass claims in, or in any part of, the within matter in the multidistrict litigation currently pending before United States District Judge Federico A. Moreno in case number MDL No. 1334 in the United States District Court [for] the Southern District of Florida, Miami Division, in the cases known as *Love, et al. v. Blue Cross and Blue Shield Association, et al.*, case number 1:03-CV-21296; . . . *Solomon, et al. v. Blue Cross and Blue Shield Association, et al.*, case number 1:03-CV-22935; and any other related case or cases.

*Grider*, 2007 WL 201011, *1.

In granting this injunction, the District Court explained that "[i]n doing so, I am not enjoining Judge Moreno from taking any action in his MDL cases in Florida. Nor am I enjoining any of the parties in the Florida litigation, including Highmark, Inc. and Capital Blue Cross, from settling any of the Florida plaintiffs' claims in the Florida litigation, which in my

13

view are different than the class claims which I certified in this Pennsylvania litigation." *Id.* at *2. The Court emphasized that the Defendants "will still be able to settle the *Love* and *Solomon* claims in Florida." *Id.* at *25.

Indeed, the District Court arrived at this view, in part, based on statements from the Defendants themselves, who had argued at various times earlier in the proceedings that the *Grider* case was distinct from the Florida MDL. In response to discovery requests regarding the Florida MDL, for example, Capital stated that the MDL "concerns unrelated defendants with different payment policies, different payment practices, and different payment software," and explained that *Love* and *Solomon* "do not involve defendant [Keystone Health Plan] Central's HMO."

D. Proposed Settlement Agreement Reached in *Love*

On April 27, 2007, after engaging in court-ordered mediation, the plaintiffs in the *Love* case announced that they had reached a settlement with a majority of the named defendants. The settlement provides that the settling defendants will pay $128.3 million to members of the settlement class and will adopt a range of new policies and procedures concerning their business practices. In exchange, the settling defendants will be released from all causes of action, judgments, and claims of every kind "that were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to" the transactions and conduct giving rise to the settlement agreement. *Love v. Blue Cross & Blue Shield*

14

*Association et al.* Settlement Agreement, at 88-89 (Apr. 27, 2007). The settlement class is defined in the agreement as:

> [A]ny and all Physicians, Physician Groups and Physician Organizations who provided Covered Services to any Plan Member or any individual enrolled in or covered by a Plan offered or administered by any Person named as a defendant in the Complaint or by any other primary licensee of the [Blue Cross and Blue Shield Association] or by any of their respective current or former subsidiaries or Affiliates, in each case from May 22, 1999 through the Preliminary Approval Date. The Class shall exclude: (I) all Persons who, in accordance with the terms of this Agreement, execute a timely request for exclusion (Opt-Out) from the Class; and (ii) the Blue Parties, their Affiliates and any of their officers, directors and employees.

*Id.* at 6. Under this definition, the *Love* settlement class would include Dr. Grider and nearly all of the Pennsylvania physicians she represents in the *Grider* litigation.

In light of the progressing settlement activity in the Florida MDL and the likelihood that it will impact the claims in *Grider*, the affected parties have filed the appeals currently before this Court. Specifically, currently before us are the consolidated appeals of: (1) Capital, James Mead, Keystone, and Joseph Pfister (No. 07-1231); (2) Highmark and John

15

Brouse (No. 07-1232); and (3) Crowell & Moring and its attorneys (No. 07-1270).

II.

We exercise jurisdiction over this case pursuant to 28 U.S.C. § 1292(a)(1). When determining whether or not a district court has the authority to issue an injunction under the All Writs Act, we exercise plenary review. *See*, *e.g.*, *In re Diet Drugs Prods. Liab. Litig. II*, 369 F.3d 293, 304 (3d Cir. 2004). Once that authority has been established, a district court's decision to issue such an injunction is reviewed for abuse of discretion. *Id.* In addition, "[w]e review the terms of an injunction for an abuse of discretion, underlying questions of law receive de novo review, and factual determinations are reviewed for clear error." *Id.* (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 261 F.3d 355, 363 (3d Cir. 2001)) (internal quotation marks omitted).

III.

The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The All Writs Act confers on courts 'extraordinary powers' that are 'firmly circumscribed.'" *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1132 (11th Cir. 2005) (quoting *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1358 (5th Cir. 1978)).

16

Typically, the All Writs Act has been used by federal courts to enjoin action by state courts that threatens the federal court's jurisdiction. In this context, the Anti-Injunction Act restricts injunctions under the All Writs Act that have the effect of staying a state court proceeding to those "expressly authorized by Act of Congress, or where necessary in aid of [a federal court's] jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.[2]

---

[2]We have repeatedly noted that the two statutes' "parallel 'necessary in aid of jurisdiction' language is construed similarly." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 134 F.3d 133, 143 (3d Cir. 1998) (citing *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 201 n.9 (3d Cir. 1993)). Nonetheless, these *similar* standards are not *identical*. The Anti-Injunction Act authorizes writs that are "necessary in aid of . . . jurisdiction." 28 U.S.C. § 2283. The All Writs Act, on the other hand, authorizes all writs "necessary *or appropriate* in aid of . . . jurisdiction[]." 28 U.S.C. § 1651(a) (emphasis added). The use of the disjunctive "or" followed by the more expansive "appropriate" connotes a larger quantum of injunctive authority than that provided by the Anti-Injunction Act. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise . . . ."). Thus, this Court has recognized that "[i]nsofar as [the All Writs Act] also permits writs 'appropriate in aid' of jurisdiction, the court's authority to issue writs is, if anything, broader than the exception contained in the Anti-Injunction Act." *In re Diet Drugs*, 282 F.3d at 239.

17

In *In re Diet Drugs Products Liability Litigation I*, 282 F.3d 220 (3d Cir. 2002) ("*In re Diet Drugs*"), for example, we upheld an injunction that had been issued under the All Writs Act to stop the parties from litigating in state court. There, patients had brought various class action cases against diet drug manufacturers after a link had been discovered between the drugs and valvular heart disease, and the cases were consolidated in the United States District Court for the Eastern District of Pennsylvania. *Id.* at 225. After the consolidation, the court issued an order conditionally certifying a class containing six million members and approving a settlement agreement that had been reached. As this was happening, however, one of the plaintiffs whose case had been transferred to the MDL filed an action in Texas state court, seeking to certify an independent class. In so doing, that plaintiff sought an order from the Texas court opting-out all of the members of this new class from the Pennsylvania MDL settlement class, which was granted. *Id.* at 226. In response, the United States District Court for the Eastern District of Pennsylvania issued an order enjoining class-wide opt-outs and declaring the Texas court's opt-out order null and void. *Id.* at 228.

In upholding the injunction, we were careful to explain the narrow circumstances under which such an order would be appropriate: "Without more, it may not be sufficient that prior resolution of a state court action will deprive a federal court of the opportunity to resolve the merits of a parallel action in federal court." *Id.* at 234. Rather, "[t]he traditional notion is that *in personam* actions in federal and state court may proceed concurrently, without interference from either court, and there is no evidence that the exception to § 2283 was intended to alter

18

this balance." *Id.* (quoting *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 642 (1977) (plurality opinion)) (internal quotation marks omitted). As we explained,

> [i]n ordinary actions *in personam*, "[e]ach court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court. Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principle of res adjudicata by the court in which the action is still pending . . . ."

*Id.* (quoting *Kline v. Burke Constr. Co.*, 260 U.S. 226, 230 (1922)).

Thus, we concluded in *In re Diet Drugs* that "it may not be sufficient that state actions risk some measure of inconvenience or duplicative litigation." *Id.* (citing *In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985)). Rather, an injunction under the All Writs Act is appropriate only when "the state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation." *Id.* (quoting *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 (7th Cir. 1996)). That is, "the state action must not simply threaten to reach judgment first, it must interfere with the federal court's own path to judgment."[3] *Id.*

---

[3]As the Appellees point out, we did recognize in *In re Diet Drugs* that complex class action cases are one "category of federal cases for which state court actions present a special

Of course, to the extent that this framework is useful in the current context, it is important to note that we are dealing with the use of the All Writs Act to enjoin another federal court, not a state court. Although the Appellants repeatedly resort to the rule explained above that parallel proceedings do not disturb the jurisdiction of either court, we made it clear long ago that this rule generally applies only when one court is a state court and the other is a federal court. As we explained, the "parallel

---

threat to the jurisdiction of the federal court." 282 F.3d at 235. As we explained, "[u]nder an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction." *Id.* This is so because "maintaining 'the federal court's flexibility and authority to decide' such complex nationwide cases makes special demands on the court that may justify an injunction otherwise prohibited by the Anti-Injunction Act." *Id.* (quoting *Carlough*, 10 F.3d at 202). However, we were careful to emphasize that "[t]his is not to say that class actions are, by virtue of that categorization alone, exempt from the general rule that *in personam* cases must be permitted to proceed in parallel." *Id.* at 236. Rather, "[w]hat is ultimately important, in any event, is that in both [*in rem* and *in personam*] cases state actions over the same subject matter have the potential to 'so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case.'" *Id.* (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970)).

proceedings" rule "clearly ha[s] no application to a situation in which two actions are pending in courts of equal dignity within the judicial system of a single sovereignty." *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941). In any event, this is not important here because *Grider* and the Florida MDL cases are not actually "parallel" proceedings, as we have traditionally used that term. To be considered parallel proceedings, "[t]he one must be materially on all fours with the other . . . . [T]he issues 'must have such an identity that a determination in one action leaves little or nothing to be determined in the other.'" *Smith v. S.E.C.*, 129 F.3d 356, 361 (6th Cir. 1997) (quoting *Congress Credit Corp. v. AJC Int'l, Inc.*, 42 F.3d 686, 689 (1st Cir. 1994)). Although there is overlap between *Grider* and the Florida MDL cases, none of the parties contend that they are identical in this regard.

Although *In re Diet Drugs* concerned an injunction against action in a state court – and thus involved the terms of the Anti-Injunction Act – it is still instructive in the instant case. Indeed, the lack of cases in which the All Writs Act has been used to enjoin settlement efforts in another federal court is telling. It is clear that the Act is generally used to prohibit activities in another court that threaten to undermine a pending settlement in the enjoining court. *See*, *e.g.*, *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 202-04 (3d Cir. 1993) (upholding an All Writs Act injunction directed at a state court action that threatened to derail a pending settlement in a complex multidistrict class action case). When the Act has been used to *block* settlement efforts in another court, it is typically because a party was deliberately using that forum to circumvent a pending settlement agreement in the enjoining court. This was

21

the case in both *In re Lease Oil Antitrust Litigation*, 48 F. Supp. 2d 699 (S.D. Tex. 1998), and *In re Managed Care Litigation*, 236 F. Supp. 2d 1336 (S.D. Fla. 2002).

In *In re Lease Oil Antitrust Litigation*, an MDL Panel had consolidated a series of cases asserting violations of federal antitrust laws in the United States District Court for the Southern District of Texas. After this consolidation, other plaintiffs filed an antitrust suit in Alabama state court, which did not include the federal claims. In the state forum, a settlement was proposed that would have released the federal claims pending in the Texas MDL. 48 F. Supp. 2d at 701. Facing this situation, the Texas MDL court explained that an injunction was necessary "to protect its jurisdiction over the exclusively federal antitrust claims: the Court needs to act in order to prevent the parties before it from possibly pursuing an inadequate or collusive settlement in state courts which would release the apparently stronger claims in the instant case." *Id.* at 704. Thus, the court enjoined the parties before it from entering into settlements in any other forum without its approval.

The clearest example of a court applying the All Writs Act to enjoin settlement efforts in another federal court actually came in the context of the Florida MDL in this very case. In *In re Managed Care Litigation*, the United States District Court for the Southern District of Florida found that one of the defendants had attempted to circumvent its authority by filing and immediately attempting to settle a suit in the United States District Court for the Southern District of Illinois. 236 F. Supp. 2d at 1338-39. The court explained that

22

> [a]dmittedly, in most instances, the issuance of an injunction would be in order to *protect* a settlement. Here, instead this Court seeks to *prevent* a settlement. This Court is well aware of the strong public interest favoring settlements. However, it cannot turn a blind eye to the underhanded maneuvers CIGNA took to obtain this settlement agreement. CIGNA snookered both this Court and Judge Murphy in Illinois in an obvious attempt to avoid this Court's jurisdiction.

*Id.* at 1342 (emphasis in original). Accordingly, the Florida court, emphasizing its role as an MDL court, enjoined CIGNA from participating in the Illinois settlement.

Based on the limited precedent in this area, there does not appear to be any basis for the injunction in this case. Although significant resources have been invested in the *Grider* litigation to this point, there is simply no support for the proposition that a court may enjoin parties from participating in or reaching a bona fide settlement in another federal court that may dispose of claims before it – particularly when there is no pending settlement in the enjoining court and the other federal court is an MDL court charged with attempting to reach a global settlement.[4]

---

[4]The Appellees argue that the injunction does not in any way interfere with the Florida MDL because the claims in *Grider* involve only Keystone, which is not a defendant in *Love* and *Solomon*. As explained above, the complaints in the Florida cases purport to include the subsidiaries of all of the named

23

First, unlike in *In re Lease Oil Antitrust Litigation* and *In re Managed Care Litigation*, there is no evidence of any collusion or wrongdoing by the *Grider* Defendants. Rather, there is a consolidated MDL in Florida that appears to have reached a settlement on claims similar to the ones in *Grider* after court-ordered mediation. Indeed, because of the injunction issued by the District Court, attorneys from Capital and Highmark were not even at the table when the existing settlement agreement was formed, subduing any suggestion that they were trying to manipulate the settlement to deliberately affect the *Grider* claims.

---

defendants, which include Capital and Highmark. However, while some of those subsidiaries are specifically listed, Keystone Health Plan Central, Inc. is not a specifically named defendant. Regardless of whether or not Keystone could be called into court as a defendant on this basis, it is clear that the settlement agreement could still settle claims with those subsidiaries in an attempt to reach a global settlement. Indeed, the settlement agreement as it is currently written releases the settling defendants themselves as well as their "present and former parents, divisions and Affiliates and each of their respective current or former officers, directors, employees, agents, insurers and attorneys." *Love v. Blue Cross & Blue Shield Association, et al.* Settlement Agreement, at 88 (Apr. 27, 2007). Thus, it is clear that, although the claims against Keystone may not be as squarely presented in the Florida MDL as they are in *Grider*, they are tied up with the MDL court's settlement efforts.

Second, "[a]n injunction under the All Writs Act invokes the equitable power of the court; thus, as is similarly the case for traditional injunctions, a court may not issue an injunction under the All Writs Act if adequate remedies at law are available." *U.S. Army Corps of Eng'rs*, 424 F.3d at 1132 (citing *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1526 n.13 (11th Cir. 1994); *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100-01 (11th Cir. 2004)). Under this standard, the general rule is that "if a party will have opportunity to raise its claims in the concurrent federal proceeding sought to be enjoined, that concurrent proceeding is deemed to provide an adequate remedy at law." *Id.*; *see also Porto Rico Tel. Co. v. Puerto Rico Commc'n Auth.*, 189 F.2d 39, 41 (1st Cir. 1951).

Here, that adequate remedy at law is Federal Rule of Civil Procedure 23(e), which provides that "[a]ny class member may object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A)," and that "[a]n objection made under Rule 23(e)(4)(A) may be withdrawn only with the court's approval." Fed. R. Civ. P. 23(e)(4)(A) & (B). To the extent that the actual proposed settlement in *Love* affects the *Grider* class members unfairly, those class members may object, and Judge Moreno can deal with the objections. Indeed, in *In re Managed Care Litigation*, Judge Moreno explained that courts "must operate on the basis of the assumption that all federal judges follow the law and protect the rights of the class members in accordance with Rule 23 of the Federal Rules of Civil Procedure." 236 F. Supp. 2d at 1342-43.

25

The Appellees have not explained why Rule 23(e) is not an adequate remedy at law that would militate against injunctive relief under the All Writs Act. They have argued instead that they cannot avail themselves of the protections of Rule 23(e) because they are not members of the *Love* class. But if it is true that the *Grider* class members are not members of the *Love* settlement class, any settlement reached in *Love* would not affect the *Grider* case at all because the *Grider* class members would not have to sign a release of claims. Under these circumstances, there would be no need for an injunction.

This is not to say that there are not valid concerns with allowing the *Grider* Defendants to proceed with the Florida settlement discussions, even though there is no evidence of collusion to this point. Although everyone involved in this case admits there is overlap between the claims in *Grider* and the claims in *Love*, there are aspects of the *Grider* claims that are not at issue in *Love*. Primarily, the *Love* claims do not cover the Defendants' behavior with respect to capitation payments that is at issue in *Grider*. Rather, *Love* is limited to the Defendants' procedures for paying fee-for-service reimbursements. In addition, the relevant dates of the class periods differ. In *Grider*, the class includes anyone who rendered services from January 1, 1996 through October 5, 2001, whereas the *Love* settlement class period is from May 22, 1999 through the date when the settlement is preliminarily approved.[5] But any fear

_____

[5]In addition to these two distinctions, the Appellees repeatedly argue that there is a major difference between the cases because the reimbursement systems used by Keystone are not used by the defendants in *Love*. That is, the *Love* defendants

26

that the Defendants may use future settlement discussions in Florida to release themselves from liability without ever having to answer for certain claims that are unique to the *Grider* litigation is assuaged by the protections contained in Rule 23(e).

Finally, our conclusion that the injunction issued by the District Court was an abuse of discretion is buttressed by the fact that the court it sought to enjoin is the site of a multidistrict consolidation on the matters at issue in *Grider*. The very purpose of such a consolidation is to conserve judicial resources by resolving as many claims as possible. *See In re Managed Care Litig.*, 236 F. Supp. 2d at 1342-43. Thus, although the *Grider* case itself is not part of the MDL, to the extent that the MDL court can achieve a global settlement that appropriately and fairly deals with a range of claims, other federal courts should be willing to let it do so absent some indication of collusion.

Given the facts of this case, we are compelled to conclude that the District Court abused its discretion by

do not use software from Synertech to process claims, whereas Keystone does. However, this is a spurious distinction. Synertech is not a party in this case. Instead, the claims asserted by the *Grider* plaintiffs target the behavior of Keystone (i.e., downcoding and claim bundling) that happened to be implemented by the software of Synertech. There is no argument that Synertech's involvement affected the downcoding and claim bundling in a way that made it materially different than the downcoding and claim bundling that was averred in *Love*.

27

resorting to the All Writs Act.[6]  We have no doubt that the injunction issued in this case was a good faith attempt by the District Court to keep the *Grider* claims before it after presiding over many years of discovery and pre-trial disputes.  But we do not believe that this is an appropriate instance in which to use the power conferred by the All Writs Act.  This is essentially a case where another court has "threaten[ed] to reach judgment first," not where action in another court has "interfere[d] with the [enjoining] federal court's own path to judgment."  *In re Diet Drugs*, 282 F.3d at 234.  That is, there is no evidence that the Appellants were trying to swindle the system to avoid the District Court's jurisdiction by "settling on the cheap" in another

---

[6]The District Court also supported its decision to issue the injunction in this case by citing the so-called "first filed" rule, as discussed in *Crosley Corp.*, 122 F.2d 925.  However, this rule has no application in the circumstances of this case.  Rather, the later-filed case must be "truly duplicative of the suit before [the court]."  *Smith*, 129 F.3d at 361.  That is, "[t]he one must be materially on all fours with the other . . . .  [T]he issues 'must have such an identity that a determination in one action leaves little or nothing to be determined in the other.'"  *Id.* (quoting *Congress Credit Corp.*, 42 F.3d at 689).  In *Crosley*, for example, the two suits at issue were filed by the same parties involving the same declaratory judgment in a patent case.  Those simply are not the facts of the instant case.  Here, the *Love* and *Solomon* cases were filed by plaintiffs who have no involvement whatsoever with the *Grider* case.  And the claims in *Love* and *Solomon* are neither identical claims, nor compulsory counter-claims in *Grider*.  As such, the District Court's injunction order cannot be supported by citing the first filed rule.

forum.  In addition, the injunction has had the effect of limiting the ability of an MDL court to comprehensively manage the matter before it, undermining the very purpose of such a consolidation.  Accordingly, we conclude that the District Court abused its discretion by using the All Writs Act to enjoin the parties in this case.[7]

## IV.

For the forgoing reasons, we will vacate the injunction issued by the District Court.

---

[7]Because we conclude that the District Court abused its discretion by issuing the injunction in this case, we do not address the remainder of the Appellants' arguments.

29