In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 17-1655

IN RE: JIMMY JOHN'S OVERTIME LITIGATION

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
Nos. 14-cv-5509, 15-cv-1681 and 15-cv-6010 — **Charles P. Kocoras**, *Judge.*

---

ARGUED NOVEMBER 8, 2017 — DECIDED DECEMBER 14, 2017

---

Before WOOD, *Chief Judge*, and FLAUM and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs-appellants brought this collective and class action lawsuit against Jimmy John's[1] on behalf of all assistant store managers nationwide for violations of the Fair Labor Standards Act ("FLSA"). Although the vast majority of plaintiffs work in stores owned by franchisees,[2] they claim that Jimmy John's is their joint employer.

---

[1] The Jimmy John's corporate defendants comprise Jimmy John's, LLC; Jimmy John's Enterprises, LLC; and Jimmy John's Franchise, LLC (collectively, "Jimmy John's").

[2] Jimmy John's owns just 2% of their stores; the rest are operated by franchisees.

Two years into this litigation, plaintiffs also filed separate law-
suits against their franchisee employers in federal district
courts across the country, asserting the same claims. The dis-
trict court subsequently enjoined plaintiffs from pursuing
their lawsuits against the franchisee employers until their
claims against Jimmy John's were resolved. We reverse.

## I. Background

### A. Consolidation

This consolidated class and collective action began as
three separate lawsuits.

On July 18, 2014, plaintiff Emily Brunner filed a complaint
in the Northern District of Illinois against Jimmy John's and
her franchisee employer for violations of the FLSA and Illinois
state wage and hour laws. Brunner, an assistant store man-
ager at a Jimmy John's sandwich shop, alleged that she was
misclassified as exempt from federal and state wage-and-
hour laws and sought unpaid overtime. Brunner brought the
suit as a putative class and collective action on behalf of all
assistant store managers who worked at both franchisee-
owned and corporate-owned Jimmy John's restaurants na-
tionwide.

On February 25, 2015, plaintiff Alexander Whiton filed a
separate class action complaint in the Northern District of Il-
linois that asserted the same claims against Jimmy John's and
his franchisee employer. On March 12, 2015, the district court
consolidated the *Whiton* action with the *Brunner* action.

On March 2, 2015, plaintiff Scott Watson filed a complaint
in the Southern District of Ohio that asserted the same claims
on behalf of the same putative class. Watson did not name any
franchisee defendants, but rather only named Jimmy John's in

its capacity as the corporate franchisor. In July 2015, the Southern District of Ohio transferred the *Watson* action to the Northern District of Illinois.

On January 14, 2016, the *Watson* action was consolidated with *Brunner* and *Whiton*. Since then, the three cases have proceeded together under the caption *In re: Jimmy John's Overtime Litigation*.

## B.  Certification and Notice

In late 2015, before *Watson* was consolidated with *Brunner* and *Whiton*, the district courts presiding over the two cases conditionally certified nationwide collective actions.

Because the two collective actions covered the same people and claims, the district courts ordered the parties to meet and confer to coordinate a process for giving notice to putative members. During the negotiations, Jimmy John's claimed that it did not maintain employment records for franchisee employees and thus did not have contact information for the vast majority of putative collective members. The parties disagreed about whether Jimmy John's could reasonably obtain that information from non-party franchisees, which led to an impasse in the negotiations about the notice process. Before they could reach an agreement, counsel for the *Watson* plaintiffs issued 280 subpoenas to franchisees in an effort to collect contact information.

Ultimately, *Watson* was consolidated with *Brunner* and *Whiton* to facilitate and expedite the notice process. After further negotiations, the parties agreed that Jimmy John's would send a letter to the non-party franchisees asking for contact information for their assistant managers. Then, Jimmy John's would provide any contact information it received to the

claims administrator. In turn, the claims administrator would disclose to both parties the contact information for members who opted into the collective action. Plaintiffs could issue third-party subpoenas to non-party franchisees who did not voluntarily disclose the contact information. In February 2016, the court entered an order reflecting the parties' agreement.

Approximately 660 individuals joined the FLSA collective action. Of those, about 600 work at stores operated by franchisees, and 60 work at corporate-owned stores.

## C. Bifurcated Discovery

Shortly after the cases were consolidated, the district court stayed all pending claims against the franchisee defendants until it decided whether Jimmy John's could be held liable as a joint employer. In March 2016, the district court judge reiterated that he wanted to resolve the joint-employer issue first. To that end, he ordered plaintiffs to earmark their discovery requests as either joint-employer-related or merits-related.

In the months that followed, Jimmy John's complained that plaintiffs were improperly commingling merits discovery with joint-employer discovery. In response, the district court bifurcated discovery into two phases. The district judge set a discovery deadline of December 2, 2016 and ordered the parties to focus solely on discovery related to the joint-employer issue. The district court allowed the parties to depose thirty named and opt-in plaintiffs, the franchisees that employed them, and the Jimmy John's corporate representatives for those franchisees.

By the time joint-employer discovery ended, the parties had deposed twenty named and opt-in plaintiffs who were

collectively employed by thirteen franchisees. Although plaintiffs were entitled to depose all thirteen franchisees, they only deposed five. Shortly before the discovery cut-off date, plaintiffs cancelled the remaining eight franchisee depositions.

### D. The Franchisee Cases

Shortly after the close of joint-employer discovery, three opt-in plaintiffs filed collective action lawsuits against their franchisee employers in other federal district courts, asserting the same misclassification claims. Specifically, Patrick Coyne sued his franchisee employer in the Eastern District of Missouri on December 15, 2016; Jared Ruder sued his franchisee employer in the District of Arizona on December 19, 2016; and Sebastian Lucas sued his franchisee employer in the Central District of Illinois on December 20, 2016. Jimmy John's was not named as a defendant in any of those lawsuits.

These plaintiffs claim they needed to pursue actions against their franchisee employers because the FLSA statute of limitations was running continuously on those claims. They also contend that they could not have originally sued their franchisee employers in the Northern District of Illinois because that court lacked personal jurisdiction over the out-of-state franchisees and lacked venue over the out-of-district franchisees. Jimmy John's does not dispute this contention.

### E. The Anti-Suit Injunction

Jimmy John's moved to enjoin those three plaintiffs from pursuing their lawsuits against the franchisee employers until their claims against Jimmy John's were resolved.

At the initial hearing on that motion, the district court asked plaintiffs' counsel whether he had considered moving

for stays in the franchisee cases. The district court went on to
explain:

> I guess what I am trying to avoid is a lot of un-
> necessary briefing if there is an accommodation
> that, since this case is a little longer in the tooth
> than something recently filed; and, it covers, if
> not entirely all of the same parties, but at least
> the same subjects; and, clearly, whatever hap-
> pens in this case is going to have an impact on
> any other case involving any of the franchises
> that may not be specifically involved as a party
> in this case, that I just hate to see a lot of money
> spent for no meaningful good end ….

The district court gave the parties time to reach an accom-
modation "so the cases [did] not trip all over each other."

The parties returned two weeks later because they were
unable to reach an agreement. Plaintiffs' counsel informed the
district court that plaintiffs agreed to stay the franchisee cases
if Jimmy John's agreed to toll the FLSA statute of limitations
for those cases. However, Jimmy John's refused, claiming that
it had no power to compel its franchisees to agree to tolling.

The district court granted Jimmy John's motion for an anti-
suit injunction from the bench. The district judge reasoned
that an anti-suit injunction "would be fair because if [he] or-
der[ed] the plaintiffs in this case to stay any proceeding in
some other jurisdiction, their interests are protected here." He
acknowledged that he did not have the power to tell other Ar-
ticle III judges "how to run their shop." However, he con-
cluded that he did "have the power to prevent the plaintiffs

in front of [him] from staying [sic] any actions in another jurisdiction, in the interest of harmony and delaying expense and overlapping work for judges doing the same kind of thing." He further noted that "[t]here are all kinds of reason[s] that justif[y] the stay as to the parties before [him]." One week later, the district court issued an order enjoining the three plaintiffs from pursuing their cases in other jurisdictions until further order of the court.

The next day, the district court modified the injunction to allow plaintiffs to file motions to toll the statute of limitations in the franchisee cases.[3] The district judge granted this "limited request," but reiterated that he did not want "a [spate] of litigation conduct in the other cases" or "needless duplication or potential needless duplication."[4]

The district court has since issued four more orders extending the anti-suit injunction to additional lawsuits brought by opt-in plaintiffs against their franchisee employers. In total, the district court has now enjoined opt-in plaintiffs from

---

[3] In a Rule 23 class action, the statute of limitations stops running on the date the class action is filed. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 545–52 (1974). In contrast, in a collective action under the FLSA, the statute of limitations continues to run for each potential opt-in plaintiff until he or she affirmatively opts into the lawsuit. 29 U.S.C. § 256.

[4] Two of the district courts presiding over the franchisee cases have refused to toll the FLSA statute of limitations while the anti-suit injunction is in effect. *See* Order, *Ruder v. CWL Invs. LLC*, No. 16-cv-4460 (D. Ariz. July 27, 2017), ECF No. 21; Mem. & Order, *Coyne v. Four Leaf Clover Invs. LLC et al.*, No. 16-cv-1937, ECF No. 22 (E.D. Mo. June 9, 2017).

proceeding in thirteen lawsuits in twelve federal district courts.[5]

## II. Discussion

We review a district court's anti-suit injunction for abuse of discretion. *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 272 (7th Cir. 1998).

Plaintiffs argue that the district court abused its discretion by: (1) failing to analyze whether the All Writs Act authorized an anti-suit injunction; and (2) failing to consider the traditional preliminary injunction factors or make the necessary findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 65.

### A. The District Court's Authority to Enjoin the Franchisee Cases

The district court never identified the source of its authority to issue the anti-suit injunction. Nevertheless, Jimmy John's claims that the district court had authority to enjoin the

---

[5] Those cases are: *Coyne v. Four Leaf Clover Invs., LLC, et al.*, No. 16-cv-1937 (E.D. Mo.); *Ruder v. CWL Invs. LLC*, 16-cv-4460 (D. Ariz.); *Lucas v. JJ's of Macomb, Inc.*, No. 16-cv-3328 (C.D. Ill.); *Mende v. Wildcat Invs., LLC, et al.*, No. 17-cv-286 (S.D. Ohio); *Gibbs v. STP JJ Team I, LLC*, No. 17-cv-6238 (W.D.N.Y.); *Beck v. Savory Sandwiches, Inc.*, No. 17-cv-1009 (D. Colo.); *Buron v. Quain Enters., LLC*, No. 17-cv-60809, (S.D. Fla.); *Hart v. Donostia, LLC*, No. 17-cv-134 (W.D. Tex.); *Watt v. Fox Rest. Venture, LLC, et al.*, No. 17-cv-2104 (C.D. Ill.); *Buchholz, et al. v. Gourmet Subs of Charlotte, LLC*, No. 17-cv-231 (W.D.N.C.); *Jones v. TSG Staffing, LLC*, No. 17-cv-11388 (E.D. Mich.); *Kroboth v. Kidds Rests., Inc.*, No. 17-cv-519 (S.D. Ill.); *Mims v. WTR Enters., Inc.*, No. 17-cv-84 (N.D. Ga.). One of those cases—*Buchholz*—has proceeded despite the anti-suit injunction because one of the named plaintiffs in that case is not an opt-in plaintiff in this action.

franchisee cases pursuant to its inherent equitable powers, the All Writs Act, or both.

### 1. Inherent Equitable Powers

As a general rule, federal district courts "avoid[] interference with the process of each other." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922) (quoting *Covell v. Heyman*, 111 U.S. 176, 182 (1884)). Accordingly, unless the lawsuits are directed toward the same property, "another action for the same cause in another jurisdiction is not precluded." *Id.* at 230.

In some circumstances, however, a district court may enjoin parties from pursuing duplicative litigation in another district court. In *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180 (1952), the Supreme Court gave lower courts "an ample degree of discretion" to resolve issues related to duplicative litigation. *Id.* at 183–84. The Court explained that such discretion is necessary because "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems." *Id.* at 183. Instead, the Court held that "[t]he factors relevant to wise administration … are equitable in nature." *Id.*; *see also Gates v. Syrian Arab Republic*, 755 F.3d 568, 580 (7th Cir. 2014), *overruled on other grounds by Rubin v. Islamic Republic of Iran*, 830 F.3d 470 (7th Cir. 2016), *cert. granted*, 137 S. Ct. 2326 (June 27, 2017) (No. 16-534) (concluding that "[t]he equities … weigh[ed] decisively in favor" of granting an anti-suit injunction); *Asset Allocation & Mgmt. Co. v. W. Emp'rs Ins. Co.*, 892 F.2d 566, 568,

572 (7th Cir. 1989) ("The power is viewed as an outgrowth of the equitable doctrine.").[6]

For example, we have held that a district court may enjoin a defendant from pursuing an "identical" claim against the plaintiff in another district court that should have been, but was not, asserted as a compulsory counterclaim in the first case. *See Asset Allocation*, 892 F.2d at 571–72. And we have explained that, if "[t]wo simultaneously pending lawsuits involv[e] identical issues … between the same parties," the first court has the power to "enjoin[] the prosecution of the second suit." *Martin v. Graybar Elec. Co.*, 266 F.2d 202, 204 (7th Cir. 1959). Avoiding duplicative litigation is desirable "to prevent the economic waste … which would have an adverse effect on the prompt and efficient administration of justice." *Id.*; *see also Gates*, 755 F.3d at 579–80 (affirming district court's decision to enjoin plaintiffs from pursuing duplicative litigation in another district because "[s]uch duplicative litigation … wastes judicial and party resources and needlessly muddles proceedings in both districts").

### 2.  *The All Writs Act*

The All Writs Act also allows district courts to enjoin parallel litigation in both federal and state courts under certain circumstances.[7] The statute provides that courts "may issue

---

[6] In *Asset Allocation*, we said that "[i]t is not a traditional equitable power that the courts are exercising in these cases but a new power asserted in order to facilitate the economical management of complex litigation." 892 F.2d at 572.

[7] A court's authority under the All Writs Act is not completely distinct from its inherent equitable powers. *See Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999) ("The All Writs Act invests a court with a power essentially equitable …."); *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527

all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The Supreme Court has interpreted the Act to authorize a federal court to 'issue such commands … as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" *In re Application of Cty. Collector of Cty. of Winnebago, Ill.*, 96 F.3d 890, 900 (7th Cir. 1996) (alteration in original) (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977)). This includes the ability to enjoin litigation in another court. *See, e.g.*, *In re VMS Sec. Litig.*, 103 F.3d 1317, 1323–24 (7th Cir. 1996), *overruled on other grounds by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983 (7th Cir. 2010) (affirming injunction against subsequent litigation in state court under the All Writs Act).

However, an anti-suit injunction is an "extraordinary" form of relief. *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1203–04 (7th Cir. 1996); *see also Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) ("[I]njunctive relief under the All Writs Act is to be used 'sparingly and only in the most critical and exigent circumstances.'" (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers))).

It is particularly rare for a federal court to enjoin litigation in another federal court. *See Negrete v. Allianz Life Ins. Co. of N.*

---

U.S. 308, 326 n.8 (1999) (noting that the power conferred by the predecessor of the All Writs Act is coextensive with a court's equitable powers); *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004) (referring to the All Writs Act as "a codification of the federal courts' traditional, inherent power to protect the jurisdiction they already have").

*Am.*, 523 F.3d 1091, 1099 (9th Cir. 2008) (explaining that "injunctions of that nature … are not typical," but rather "appear to be rarae aves [rare birds]"); *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 330 (3d Cir. 2007) ("[T]he lack of cases in which the All Writs Act has been used to enjoin settlement efforts in another federal court is telling."); Martin H. Redish & Megan B. Kiernan, *Avoiding Death by A Thousand Cuts: The Relitigation of Class Certification and the Realities of the Modern Class Action*, 99 Iowa L. Rev. 1659, 1684 n.128 (2014) ("Though a federal injunction against a collateral federal proceeding is theoretically possible, such an occurrence is highly unlikely."). As a result, "there is precious little authority dealing with injunctions directed by a district court to a court of equal dignity—another federal district court." *Negrete*, 523 F.3d at 1099; *see also Grider*, 500 F.3d at 331 (concluding that there is "limited precedent in this area").

It is more common for district courts to invoke the All Writs Act to enjoin litigants from pursuing parallel litigation in a state court. However, there are additional limitations on a district court's ability to enjoin state court proceedings. Specifically, "an injunction that halts state litigation is permissible only if it satisfies [the Anti-Injunction Act]." *Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 483 (7th Cir. 2015). That statute provides that federal courts "may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

Because this case involves a federal-federal injunction, cases involving federal-state injunctions are not directly applicable. As Jimmy John's points out, the All Writs Act allows

courts to issue injunctions that are "necessary *or appropriate* in aid of their respective jurisdictions," *id.* § 1651(a) (emphasis added), whereas the Anti-Injunction Act only allows injunctions that are "necessary in aid of its jurisdiction." *Id.* § 2283. Indeed, the Supreme Court has said that a court's "supplemental powers [under the All Writs Act] are not limited to those situations where it is 'necessary' to issue the writ or order 'in the sense that the court could not otherwise physically discharge its appellate duties.'" *N.Y. Tel. Co.*, 434 U.S. at 173 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273 (1942)). Moreover, federal-state injunctions implicate concerns about federalism and comity that federal-federal injunctions do not. *See Winkler*, 101 F.3d at 1202–03 (explaining that the Anti-Injunction Act was intended to protect "principles of federalism and comity"). For these reasons, a court has broader authority to enjoin proceedings in another federal court than it does to enjoin proceedings in a state court. *See In re Diet Drugs*, 282 F.3d 220, 239 (3d Cir. 2002).

Nevertheless, because "the 'aid of jurisdiction' language in the All Writs Act parallels that of the Anti-Injunction Act, … courts regularly construe the two statutes similarly with respect to their 'aid of jurisdiction' clauses." *Winkler*, 101 F.3d at 1203. Thus, although this case involves a federal-federal injunction, we may still look to cases involving federal-state injunctions for guidance. *See Grider*, 500 F.3d at 330 (explaining that a case involving a federal-state injunction under the Anti-Injunction Act was "still instructive" in a case that involved a federal-federal injunction); *Negrete*, 523 F.3d at 1099 (same); *In re Baldwin-United Corp.*, 770 F.2d 328, 335 (2d Cir. 1985) ("[C]ases interpreting … the Anti-Injunction Act have been helpful in understanding the meaning of the All-Writs Act.").

Traditionally, "the 'aid of jurisdiction' exception to the Anti-Injunction Act applie[d] only to parallel state *in rem* rather than *in personam* actions." *Winkler*, 101 F.3d at 1202. However, "[t]here has been some limited expansion of this exception beyond in rem actions, most notably in the context of school desegregation cases and consolidated multidistrict litigation." *Zurich Am. Ins. Co. v. Superior Court for the State of Cal.*, 326 F.3d 816, 825 (7th Cir. 2003) (citation omitted). The rationale for extending the exception to school desegregation cases is that "conflicting orders from different courts would only serve to make ongoing federal oversight unmanageable." *Winkler*, 101 F.3d at 1202. Similarly, in the context of multidistrict litigation ("MDL"), courts have reasoned that "the jurisdiction of a multidistrict court is 'analogous to that of a court in an in rem action or in a school desegregation case, where it is intolerable to have conflicting orders from different courts.'" *Baldwin-United Corp.*, 770 F.2d at 337 (quoting 17 C. Wright & A. Miller & E. Cooper, Federal Practice & Procedure § 4225, at 105 n.8 (1985)).

This Court has held that the "necessary in aid of jurisdiction" exception to the Anti-Injunction Act "empower[s] the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's jurisdiction nugatory." *Winkler*, 101 F.3d at 1202 (quoting Martin H. Redish, *The Anti-Injunction Statute Reconsidered*, 44 U. Chi. L. Rev. 717, 754 (1977)). Put differently, "an injunction may be issued where 'necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.'" *Id.* at 1201 (quoting *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970)).

In *Winkler*, we held that the "in aid of jurisdiction" exception to the Anti-Injunction Act allows district courts presiding over MDL proceedings to "issu[e] injunctions to protect the integrity of their rulings, including pre-trial rulings like discovery orders, as long as the injunctions are narrowly crafted to prevent specific abuses which threaten the court's ability to manage the litigation effectively and responsibly." *Id.* at 1203. There, "the district court quite reasonably believed that the plaintiffs were resorting to the state courts for the specific purpose of evading its ruling denying discovery." *Id.* at 1202. We reasoned that "an express purpose of consolidating multidistrict litigation for discovery is to conserve judicial resources by avoiding duplicative rulings," and thus district courts have a statutory duty to manage MDLs "as efficiently as possible." *Id.* (footnote omitted). We therefore concluded that, "[w]here a litigant's success in a parallel state court action would make a nullity of the district court's ruling, and render ineffective its efforts effectively to manage the complex litigation at hand, injunctive relief is proper." *Id.*

More recently, however, we interpreted "in aid of jurisdiction" narrowly. *See Adkins*, 779 F.3d at 483–84. In *Adkins*, we said that "[m]any decisions by the Supreme Court over the last 30 years tell us that 'jurisdiction' means adjudicatory competence." *Id.* at 484. And we explained that "[w]e have never viewed parallel *in personam* actions as interfering with the jurisdiction of either court." *Id*. (quoting *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 642 (1977) (plurality opinion)). At the same time, we acknowledged that there might be "extreme situations in which a state court could imperil a federal court's adjudicatory power over *in personam* actions," citing our prior decision in *Winkler* as an example. *Id.* at 485. We also recognized that state litigation can affect federal litigation if the

state court reaches a final decision first, thus potentially resulting in claim and issue preclusion. *Id.* at 484. However, we clarified that "the potential effect of one suit on the other does not justify an injunction." *Id.* Thus, although the parties argued that ending the parallel state litigation would be "prudent, beneficial, [and] helpful," we rejected "the unstated premise … that [the Anti-Injunction Act] allows whatever a federal court thinks is good litigation management." *Id.* at 485.

    3.   *The District Court Lacked Authority to Enjoin the Franchisee Cases*

With these principles in mind, we now turn to the present case. Here, Jimmy John's argues that the anti-suit injunction was authorized under the district court's inherent equitable powers and/or the All Writs Act because it was necessary to prevent duplicative litigation, avoid inconsistent rulings, and protect the district court's pretrial orders regarding discovery and notice procedures. These arguments are unavailing.

First, Jimmy John's argument regarding duplicative litigation is not persuasive. In cases where a district court enjoined duplicative litigation in another district court pursuant to its inherent equitable powers, the court enjoined identical litigation *between the same parties*. *See Kerotest*, 342 U.S. at 183 (affirming stay of litigation in the Delaware district court to allow litigation in the Northern District of Illinois to proceed because "the whole of the war and all the parties to it are in the Chicago theatre" (quoting *Kerotest Mfg. Co. v. C-O Two Fire Equip. Co.*, 189 F.2d 31, 34 (3d Cir. 1951))); *Asset Allocation*, 892 F.2d at 572 (holding that the district court had authority "to enjoin the defendant from bringing a separate suit against the plaintiff in another court"); *Martin*, 266 F.2d at 203 (holding

that the district court had discretion to issue an anti-suit injunction where "there were two actions between the same parties involving identical issues pending at the same time in two United States District Courts"). Because the parties were identical in those cases, it was possible to resolve the parallel litigation in one forum rather than two. *See Kerotest*, 342 U.S. at 183 ("The Chicago suit when adjudicated will bind all the parties in both cases. Why, under the circumstances, should there be two litigations where one will suffice?" (quoting *Kerotest*, 189 F.2d at 34)). Accordingly, it made sense to halt litigation in one court to promote efficiency and conserve judicial resources. *See Martin*, 266 F.2d at 204. In other words, "[t]he premise behind a decision to enjoin concurrent proceedings in another federal district court is that the proceedings involve the same parties and issues." *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1463 (Fed. Cir. 1990).

Here, in contrast, Jimmy John's is not a party to the enjoined franchisee cases. Although those lawsuits involve the same legal claims, they were brought against different defendants: the franchisee employers.[8] Plaintiffs contend, and

---

[8] Jimmy John's argues that the district court could still enjoin the franchisee cases because Jimmy John's and the franchisees are in privity with each other. To support this argument, Jimmy John's relies on *Urbain v. Knapp Bros. Mfg. Co.*, 217 F.2d 810 (6th Cir. 1954). In that case, the Sixth Circuit held that, "[i]f the plaintiffs in the cases are identical and the defendants in one case are in privity with those in the other, even though not formal parties, the District Court which first obtains jurisdiction has the right … to enjoin proceedings brought later in another district, especially when numerous steps have been taken in the court whose jurisdiction was first invoked." *Id.* at 815. However, that decision is not binding on this Court. Moreover, in concluding that the defendants were in privity, the *Urbain* court relied on the fact that the defendant in the first action agreed in writing to defend the second suit and to indemnify the defendants in

Jimmy John's does not dispute, that the franchisee defendants cannot be joined in this case because the Northern District of Illinois lacks personal jurisdiction over the out-of-state franchisee defendants and lacks venue over the out-of-district franchisee defendants. Thus, unlike in the cases cited above, it is not possible to resolve the litigation against Jimmy John's and the franchisee employers in a single forum. As a result, this case does not raise the same concerns about efficiency and conservation of judicial resources. Moreover, we have previously suggested that an anti-suit injunction is not warranted in these circumstances. *See Asset Allocation*, 892 F.2d at 574 ("[T]he district judge had no possible ground for enjoining the suit in California from proceeding against a defendant over which the district court in Illinois might not be able to obtain jurisdiction."). In short, the franchisee suits are not duplicative. *See Grider*, 500 F.3d at 330 (concluding that actions that did not involve the same defendant were "not actually 'parallel' proceedings").

Next, Jimmy John's argues that the anti-suit injunction is necessary to prevent conflicting interpretations of written policies that overlap across the cases. At bottom, this argument amounts to nothing more than a fear that the district courts presiding over the franchisee cases might reach a final decision on the merits before this case or, at the very least, make legal determinations that could affect the present litigation. However, "the potential effect of one suit on the other does not justify an injunction." *Adkins*, 779 F.3d at 484; *see also Klay*, 376 F.3d at 1102–03 ("The simple fact that litigation involving

the second action. *See id.* at 811, 814. There is no evidence of a similar agreement between Jimmy John's and the franchisee employers in this case.

the same issues is occurring concurrently in another forum does not sufficiently threaten the court's jurisdiction as to warrant an injunction under [the All Writs Act]."). There are less drastic means—namely, issue preclusion—to address this concern.

Jimmy John's final argument—that the anti-suit injunction was necessary to protect the district court's pretrial orders regarding discovery and notice—also fails for several reasons. First, the district court never mentioned the need to protect its pretrial rulings when it issued the anti-suit injunction. Instead, the district court alluded to efficiency concerns that, standing alone, are insufficient. *See Adkins*, 779 F.3d at 485. Rule 65 requires that any order granting an injunction "state the reasons why it issued." Fed. R. Civ. P. 65(d)(1)(A). Among other things, this requirement ensures "meaningful appellate review." *H–D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 845 (7th Cir. 2012). Thus, Jimmy John's post-hoc reasoning for the district court's injunction is not entitled to any weight.

Second, even if we accept Jimmy John's proffered reason for the injunction, our precedent does not support the issuance of an anti-suit injunction in such circumstances. Jimmy John's relies primarily on our decision in *Winkler*,[9] but our

---

[9] Jimmy John's also relies on our decision in *VMS Securities*, 103 F.3d at 1317, for the proposition that district courts may use the All Writs Act to protect their discovery orders. That case, however, says nothing of the sort. Rather, we held that a district court could enjoin plaintiffs from pursuing litigation in state court that attempted an "end run" around the district court's class action settlements and final judgment. *Id.* at 1324–25; *see also Adkins*, 779 F.3d at 486 ("In *VMS Securities* the district court issued an injunction to protect the final decision in a class suit."). We have since ex-

holding in that case was limited to the MDL context. *See* 101 F.3d at 1203. In reaching that conclusion, we relied heavily on the unique nature of such proceedings. For example, we explained that "[t]he district[] courts' power to control multidistrict litigation is established by statute, and … with that power comes the duty to exercise it as efficiently as possible." *Id.* at 1202 (citing 28 U.S.C. § 1407). We also emphasized that "[a]n important aspect of that control is to prevent predatory discovery" and that "an express purpose of consolidating multidistrict litigation for discovery is to conserve judicial resources by avoiding duplicative rulings." *Id.* Because this is not an MDL, *Winkler* does not apply.

Nevertheless, Jimmy John's argues that the rationale underlying *Winkler* is still relevant because the district court here was responsible for efficiently managing three consolidated class actions. However, we have not expanded the "in aid of jurisdiction" exception of the Anti-Injunction Act beyond in rem actions, school desegregation cases, and MDLs. *See Zurich*, 326 F.3d at 825–26. Indeed, in *Adkins*, we referred to *Winkler* as an "extreme situation[]" in which the exception extended beyond *in rem* actions. 779 F.3d at 485. Some of our sister circuits have similarly limited the expansion of this exception. *See, e.g.*, *Tooele Cty. v. United States*, 820 F.3d 1183, 1190–91 (10th Cir. 2016) (refusing to apply *Winkler* to nonMDL cases); *In re Life Inv'rs Ins. Co. of Am.*, 589 F.3d 319, 331–32 & n.11 (6th Cir. 2009) (declining to extend the "in aid of jurisdiction" exception to a non-MDL complex class action).

---

plained that "[n]othing in *VMS Securities* supports the propriety of an injunction while the federal case remains in process." *Adkins*, 779 F.3d at 486. Thus, *VMS Securities* is not instructive here.

Because we interpret "in aid of jurisdiction" the same way under the All Writs Act, these cases counsel against expanding *Winkler* beyond the MDL context.

Moreover, even where courts of appeals have upheld anti-suit injunctions in non-MDL class actions, they have done so only in cases where the injunction was necessary to protect pending or finalized class settlements.[10] Absent a pending settlement or final judgment, those same courts have held that an anti-suit injunction is not appropriate. *See, e.g.*, *Negrete*, 523 F.3d at 1102–03 (holding that a non-MDL court abused its discretion by enjoining parallel litigation where a class settlement was not imminent). Here, the parties have not settled

---

[10] *See, e.g.*, *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 589 F.3d 835, 848–49 (6th Cir. 2009) (concluding that an anti-suit injunction of state court proceedings was necessary in aid of district court's jurisdiction over complex class settlement fund in a non-MDL case); *Liles v. Del Campo*, 350 F.3d 742, 746–47 (8th Cir. 2003) (holding that district court did not abuse its discretion by enjoining related federal litigation because it was "necessary to ensure the enforceability of the order approving the preliminary settlement and to prevent further draining of the limited settlement fund"); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998) (affirming an anti-suit injunction as necessary in aid of district court's jurisdiction where the district court had temporarily approved nationwide class settlement); *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 880–82 (11th Cir. 1989) (holding that a district court's injunction of state court proceedings was necessary in aid of its jurisdiction over non-MDL complex class action that had already reached settlement and final judgment); *In re Sch. Asbestos Litig.*, No. 83-0268, 1991 WL 61156, at *2–4 (E.D. Pa. Apr. 16, 1991), *aff'd mem.*, 950 F.2d 723 (3d Cir. 1991) (affirming district court's injunction of state court proceedings in a non-MDL complex class action where the parties were on the verge of settlement, there was a settlement fund, and the parties had met to discuss forming a settlement committee).

and no one contends that settlement is imminent. Thus, those cases are distinguishable.

In short, Jimmy John's does not cite to a single case in which a non-MDL court has enjoined parallel litigation in circumstances like this. Each case that Jimmy John's relies on is distinguishable because they involved MDL proceedings; pending or final class settlements and judgments; duplicative litigation between the same parties; or some combination thereof.

Finally, even if we were inclined to extend *Winkler* beyond the MDL context, an anti-suit injunction was not necessary or appropriate to protect the district court's pretrial rulings in this case. Jimmy John's argues that the franchisee lawsuits are an end run around the district court's orders regarding bifurcated discovery and notice procedures. Specifically, it argues that if the franchisee lawsuits are allowed to advance, plaintiffs could proceed directly to merits discovery, obtain more franchisee discovery, obtain contact information for more assistant store managers, and send new rounds of notice to the same assistant store managers.

The record does not suggest that the franchisee cases were filed to evade the district court's pretrial orders. Rather, plaintiffs repeatedly told the district court that they were filing the franchisee cases because the statute of limitations was running against those claims. Indeed, plaintiffs even agreed to stay the franchisee cases if the statute of limitations was tolled pending this litigation. Jimmy John's concern that plaintiffs are attempting to obtain additional franchisee discovery is equally unfounded given that plaintiffs did not even take all of the franchisee depositions that they were entitled to in this case. Therefore, unlike in *Winkler*, the district court here could

not have "reasonably believed that the plaintiffs were resorting to [other] courts for the specific purpose of evading its ruling[s]" 101 F.3d at 1202.

Additionally, while it is true that plaintiffs could proceed directly to merits discovery in the franchisee cases, it is unclear how this would interfere with the district court's discovery rulings in this case. The district court ordered the parties to focus solely on information relevant to the joint employer issue for the first phase of discovery ending on December 2, 2016. However, that deadline had passed by the time the district court issued the anti-suit injunction, and the district court has not made any rulings as to how merits discovery should proceed. Moreover, the district court has numerous case management tools at its disposal to prevent inconsistent discovery orders in the future. *See In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978) ("[C]onsultation and cooperation among the three concerned district courts, if deemed appropriate by those courts, coupled with the cooperation of the parties, would be sufficient to minimize the possibility of conflicting pretrial rulings."); *see also* Fed. Judicial Ctr., *Manual for Complex Litigation* § 20.14, at 227 (4th ed. 2004) (listing ways for judges to "coordinate proceedings in their respective courts to avoid or minimize duplicative activity and conflicts"). Thus, an anti-suit injunction is not necessary or appropriate to protect the district court's discovery orders. *Clinton*, 526 U.S. at 531, 537 (holding that a lower court's injunction was neither "'in aid of' its … jurisdiction … nor 'necessary or appropriate'" under the All Writs Act because there were "alternative remedies available").

Nor will allowing the franchisee lawsuits to proceed interfere with the notice process in this case. Plaintiffs are not barred from suing their franchisee employers under the FLSA simply because they have also sued Jimmy John's as the franchisor. *See Akins v. Worley Catastrophe Response, LLC*, 921 F. Supp. 2d 593, 598 (E.D. La. 2013) ("Had Congress wished to limit the number of collective actions that could be brought against an employer, it could have said that only 'one action to recover' may be maintained on behalf of a group of employees. It did not do so."). Indeed, plaintiffs frequently sue both their franchisee employer and the franchisor for FLSA violations under a joint employer theory. *See, e.g.*, *Orozco v. Plackis*, 757 F.3d 445 (5th Cir. 2014). Moreover, even if plaintiffs who are participating in the franchisee cases give notice to additional assistant store managers regarding their claims against the franchisee employers, that will not interfere with the notice process in this case because the notice period has closed.

In sum, the district court lacked authority to enjoin plaintiffs from pursuing their claims against the franchisee defendants in other district courts.

## B. Traditional Injunction Analysis and Rule 65

Even if the district court had authority to issue the antisuit injunction under the All Writs Act or its inherent equitable powers, that would not end our inquiry. "[A] district court must still determine whether an injunction is an appropriate exercise of its authority." *Zurich*, 326 F.3d at 824; *see also Winkler*, 101 F.3d at 1203 ("[P]ower alone is insufficient to sustain the entry of an injunction. We must also determine whether the injunction was a proper expression or exercise of that authority.") (citation omitted).

Here, plaintiffs argue that the district court abused its discretion by failing to consider the traditional factors for granting an injunction and failing to make the requisite findings of fact and conclusions of law. We agree.

As a general rule, a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, there is no adequate remedy at law, he is likely to suffer irreparable harm absent such relief, the balance of equities tips in his favor, and an injunction is in the public interest. *See Ty, Inc. v. Jones Group., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Moreover, under Rule 65(d), "[e]very order granting an injunction … must … state the reasons why it issued." Fed. R. Civ. P. 65(d). Finally, just as "the court must find the facts specially and state its conclusions of law separately" when it presides over a bench trial, "the court must similarly state the findings and conclusions that support its action" when it "grant[s] or refus[es] an interlocutory injunction." Fed. R. Civ. P. 52(a).

Here, the district judge's reasoning for the anti-suit injunction was insufficient. He pointed to "harmony and delaying expense and overlapping work for judges doing the same kind of thing." He said "[t]here are all kinds of reason[s] that justif[y] the stay as to the parties before me," but did not further elaborate on those reasons. Moreover, he did not state the legal conclusions supporting the injunction or identify the relevant legal standard. And Jimmy John's concedes that the district court did not mention or otherwise address the traditional injunction factors.

Jimmy John's argues that these omissions were not an abuse of discretion because Rule 65 and the traditional injunction factors do not apply to injunctions issued under the All Writs Act. Jimmy John's is mistaken. We have stated that anti-

suit injunctions "must also be supported by the traditional equitable requirements such as irreparable harm for which there is no adequate remedy at law." *Zurich*, 326 F.3d at 824. And we have also made clear that Rule 65 applies to anti-suit injunctions. *Adkins*, 779 F.3d at 483 (quoting Fed. R. Civ. P. 65) ("Rule 65(d)(1)(A) … provides that every order issuing an injunction must 'state the reasons why it issued.'").[11]

In *Adkins*, the parties proffered their own arguments as to why the district court had enjoined class members from prosecuting a similar class action in state court. 779 F.3d at 482–83.

---

[11] There is a circuit split on this issue. The First, Fourth, and Fifth Circuits agree that Rule 65 and traditional injunction rules apply to anti-suit injunctions. *See Scardelletti v. Debarr*, 265 F.3d 195, 212 (4th Cir. 2001), *rev'd on other grounds*, *Devlin v. Scardelletti*, 536 U.S. 1 (2002) (finding "no reason to distinguish between All Writs Act injunctions and other injunctions that must comply with Rule 65" because "an All Writs Act injunction, like any other injunction, compels obedience under threat of contempt" and "implicates the same twin purposes of providing fair notice of what an injunction requires and of facilitating appellate review"); *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 202 (5th Cir. 1979) ("[T]he All Writs Act does not free a district court from the restraints of Rule 65."); *Ben David v. Travisono*, 495 F.2d 562, 563 (1st Cir. 1974) (explaining that Rule 52 and Rule 65 embody "the common sense rule that a court should let the parties and an appellate court know why it acts, and on what factual basis," and thus, "[w]hether proceeding under the All Writs Act or not, a district court has no license to ignore that requirement"). The Second and Eleventh Circuits have held otherwise. *See Baldwin-United Corp.*, 770 F.2d at 338–39 ("Injunctions issued under the authority of the All-Writs Act stem from very different concerns than those motivating preliminary injunctions governed by Fed. R. Civ. P. 65"); *Klay*, 376 F.3d at 1100 (footnote omitted) ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns.").

However, "when we sought to learn the district court's view of this subject, we were stymied" because "the district judge ha[d] not explained why he entered the injunction." *Id.* at 483. Although the district court had provided "some hints," we concluded that this was not enough to satisfy Rule 65. *Id.* We explained that, "[b]efore issuing an injunction, a judge must identify the appropriate legal standard and make the findings of law and fact required by that standard." *Id.* Moreover, we cited the traditional preliminary injunction factors and said that "an injunction that halts state litigation is permissible only if it satisfies [the Anti-Injunction Act] *in addition to* the traditional factors." *Id.* (emphasis added). We reversed the injunction because "[t]he district judge was silent about everything that matters." *Id.*

It follows that the same requirements apply in the context of the federal-federal injunction at issue here. After all, the district court's authority for both actions is the same: the All Writs Act. Although the *Adkins* court only mentioned the Anti-Injunction Act, that statute does not give a court unlimited authority. Rather, it limits the authority that a court would otherwise have under the All Writs Act if state litigation is involved. *See Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 201 n.9 (3d Cir. 1993) ("While the Anti-Injunction Act does not provide positive authority for issuance of injunctions, it describes those situations where injunctions are not permitted. The All-Writs Act, by contrast, grants the federal courts the authority to issue injunctions where necessary in aid of their jurisdiction."). Thus, under *Adkins*, a district court that uses the All Writs Act to enjoin proceedings in another court, whether federal or state, must analyze the traditional

injunction factors and comply with Rule 65. Compliance with the rule did not occur in this instance.[12]

### III. Conclusion

For the foregoing reasons, we REVERSE the judgment of the district court.

---

[12] In light of our analysis, we need not address plaintiffs' argument that the anti-suit injunction impinges their rights under the First Amendment and the National Labor Relations Act ("NLRA").